UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
SCOTT PRAY,                                 )
                                            )
        Plaintiff,                          )
                                            )
v.                                          )
                                            )   Civ. No. 1:09-cv-11923-NMG
SMPO PROPERTIES, INC. and                   )
OSCAR SEELBINDER,                           )
                                            )
        Defendants.                         )
_____ )

## SCOTT PRAY'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Plaintiff Scott Pray ("Pray") respectfully submits his statement of undisputed material facts.

1. In or around 2007, Pray, a general contractor and builder by profession, contacted Jack Mitchell ("Mitchell"), a national developer who Pray believed might be interested in a joint venture to develop property. (Affidavit of Scott Pray ("Pray Aff.") ¶ 2). As a result of Pray's initial contact, Mitchell and his "partner" Seelbinder, had several meeting with Pray to discuss "pursuing a joint venture to develop CVS stores." (Affidavit of Richard Briansky ("Bria. Aff.") ¶ 2, at **Exhibit A**, copy of the Oscar Seelbinder Deposition ("Seelbinder Depo") at 9 and 10). Seelbinder testified that during these meetings he and Pray discussed, among other things:

> [I]ssues of ownership from a standpoint of projects that Scott [Pray] provided the relationships for leases as well as being the general contractor for the construction of the building. He would get a 25 percent position in most projects, and we negotiated. And he wanted more than that. We said, Let's see if we get the first development project done, you get 25 percent, then on the future projects that you bring to the table, Mr. Pray, then we'll increase your percentage of ownership to 33 percent. There were also discussions with regard to his construction company would have the opportunity to do the construction work, one of his

> construction companies, whichever one it was. But his pricing had to be fair and reasonable and that SMPO Real Estate, LLC would be a brokerage arm for our entity that would sell the properties. It would be paid a commission. SMPO Properties would be engaged by our entity in order to do administrative work for the entity from -- everything from bookkeeping to finance to all general administrative duties necessary to run the entity and to actually monitor the project management. But SMPO Properties was not and never was in a relationship with Mr. Pray.

(**Exhibit A** at 15, 16).

2. After the series of meetings and in reliance upon Seelbinder's representations (but before any formal documents were executed), Pray identified several potential opportunities for the joint venture including "the potential of doing a development for CVS in Taunton, Massachusetts" (the "Taunton CVS"). (**Exhibit A** at 26, 28).

3. The Taunton CVS required the joint venture to purchase the "main parcel of land" currently owned by 7-Eleven which was "one of a total of four parcels of real estate that needed to be assembled and put under contract in order to be able to make an offer to CVS for a development of one of their stores."[1] (**Exhibit A** at 9, 27).

4. After Pray identified the Taunton CVS opportunity to the joint venture Seelbinder and his

> partner, Mr. Mitchell, … contact[ed] Don Caron, Donna Caron's husband, who is employed by 7-Eleven in the real estate section and the person responsible for the property. I contacted Don Caron in order to negotiate a letter of intent to purchase the property, albeit, the other three parcels, Mr. Leach and his real estate broker friend were going to handle.

(**Exhibit A** at 28)

---

[1] **Exhibit A** at 7 and 8

Q. How did you become aware of the property?

A. Through one of my partners, Mr. Leach and Mr. Pray.

5. After the negotiations with 7-Eleven but before executing the Letter of Intent, Seelbinder had discussions with "a number of people" including Pray regarding, among other things, the terms of an offer for the "main parcel" and a $1.2 million purchase price. (**Exhibit A** at 86). Upon receiving approval from his "partners," including Pray, SMPO, on behalf of the joint venture, executed a letter of intent to purchase the Property. (**Exhibit A** at 30, 79);[2] (Bria. Aff. **Exhibit B**, a copy of the letter of intent).

6. Seelbinder provided a copy of the executed Letter of Intent to all of the "partners" including Pray. (**Exhibit A** at 81). Although the Letter of Intent identified SMPO and its assigns as the "purchaser," Seelbinder confirmed that SMPO was acting on behalf of the joint venture. Seelbinder explained that:

> the contemplation at the time was that there would be an agreement entered into with Mr. Pray, and if required to have financing to acquire the property, Mr. Pray would be obligated to personally sign as a guarantor on any loan required in the acquisition.

(**Exhibit A** at 83).

7. On or about August 28, 2007, SMPO, on behalf of the joint venture, executed a Sales Contract. (Bria Aff., ¶ 4, at **Exhibit C**, a copy of the Sales Contract). Although Seelbinder signed the contract on behalf of SMPO, he specifically testified that:

> … the thought process was, I have an understanding with Mr. Pray, but it is not yet documented, and it is not in a form that he is in agreement with, but he assures me we will get to a point and document the agreement and he will execute it so that if we have to perform in financial terms on this, he, too, will lend his financial credibility and strength of his signature for liability for the

---

[2] **Exhibit A** at 79: "From a practical business point of view, it was a facilitation by a mutual agreement to move forward to put the property under contract to purchase with the specific goal being to put contracts on the other three properties so that this would be able to be used to develop a CVS store."

> repayment of any loan, which he never did. In essence, this had several different avenues of what its purpose was for.

(**Exhibit A** at 99).

8. After Seelbinder executed the Sales Contract, securing the "main parcel," he was approached by Arista Development – a competitor attempting to acquire and develop the same four parcels of Property. (**Exhibit A** at 112). Seelbinder had:

> a number of conversations [with Arista Development and its principal Scott Weymouth].The basic elements beginning were he'd [Arista] be interested in trying to see if we can work together * * * we have control of the 7-Eleven piece, which is in between the other properties, and you don't have control of it, so we can be a joint venture, which means we'll put up our share of capital, we'll sign off on our portion of debt, we'll provide a lender if we have better terms with our lender than you've got with yours.
>
> We talked about that concept for a while. He got back to us and said his partner didn't want to do a joint venture but that they would entertain buying our contract or entering into an assignment of our contract for consideration. From there, the conversations led into different negotiations.

(**Exhibit A** at 112, 113).

9. After these "number of conversations" with Arista, Seelbinder contacted Pray informing him of this "potential opportunity this might bring about if [Arista] could perform and if he couldn't the other opportunities that it would bring about with regards to a CVS property." (**Exhibit A** at 119).

10. By e-mail dated September 5, 2007, Seelbinder, on behalf of the joint venture, detailed the potential opportunities to develop the Property and confirmed his "agreement" with Pray. (Bria. Aff. ¶ 5, at **Exhibit D**). In particular, Seelbinder represented that:

> [O]ur agreement was to have the Taunton location serve as our initial project with your participation at 25% and all future projects to reset your participation at 33% of our entity

> As regards Taunton – Scott Weymouth [Arista Development] has offered to purchase the contract for the 7-Eleven store – that contract is between SMPO Properties, Inc and 7-Eleven. regardless of the fact that the contract is SMPO it is still part of our agreement and you will participate as we agreed – you brought us to this party and we have an agreement….Nevertheless, should we move forward with Weymouth and sell the contract then you will receive 25% of the proceeds from the assignment – if we move forward with a CVS venture then the LLC we set up will provide for your interest at 25%
>
> As regards the Brooks Corporate HQ …Jerry and I thought that since we have an LLC document already set up for Taunton and that Taunton looked as thought it would not move forward toward a development project that it would be easier to use this LLC as our vehicle for BCH transaction…
>
> I would suggest that we wait to see which egg hatches first as regards the MARICS LLC and use it for the first one out of the box. Scott's ownership or participation should not change – but I don't think we need to keep creating LLCs until we need them …

(Id.).

11. After consultation with the other partners including Pray, SMPO executed an Assignment and Assumption Agreement dated February 12, 2008, assigning its rights to purchase the Property to Arista for $600,000.[3] (Bria. Aff. ¶ 6, at **Exhibit E**); (**Exhibit A** at 32). Notwithstanding SMPO's receipt of the $550,000 it failed and refused to pay Pray the 25%,

---

[3] **Exhibit A** at 30

Q. Which entity owned or controlled by you purchased the property?

A. SMPO Properties, Incorporated.

Q. Did you ultimately sell those rights to the purchase and sale agreement to a third party?

A. Yes.

Q. To whom did you sell these rights?

A. Arista Development.

Seelbinder specifically represented to Pray he would receive from the assignment. (**Exhibit A** at 41). Rather than pay Pray, Seelbinder simply ignored his calls. As Seelbinder testified:

> So somewhere after the closing of the sale, I believe Mr. Pray called me…To the best of my recollection, it kind of started off general, How are you doing …how is business, Oh, I hear that Taunton closed, you got any money to send my way? …It wasn't a very positive response. I don't remember exactly what words were used. I said, Yeah, I'll have to see. Basically, given the fact that what had been agreed to with the eventual purchaser of the property was not what actually happened and plus there were a number of other expenses that went on in regard to how that transaction went forward, I thought it best to talk with the other owners/partners to see how they felt we should respond to Mr. Pray, particularly given the fact that Mr. Pray deserted us, left us high and dry on a CVS project that we had in Central Falls, Rhode Island and refused to talk with us for over a year. I thought it best to get a consensus from the partners, and after talking with them, I just didn't call him back.

(**Exhibit A** at 40, 41).

12. Neither Seelbinder nor any of the "partners" paid Pray. (**Exhibit A** at 117). Seelbinder justified his failure to pay Pray by claiming that Pray failed to execute an agreement. (**Exhibit A** at 117).

        SCOTT PRAY
        By his attorneys,

        /s/ Richard E. Briansky
        Richard E. Briansky, Esq. (BBO# 632709)
        Prince, Lobel, Glovsky & Tye LLP
        100 Cambridge Street, Suite 2200
        Boston, Massachusetts 02114
        Phone: (617) 456-8052
        Fax:   (617) 456-8100
        rbriansky@princelobel.com

Dated: May 6, 2010

**CERTIFICATE OF SERVICE**

      I, Richard E. Briansky, hereby certify that this document was filed through the Court's ECF System and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 6, 2010.

                                */s/ Richard E. Briansky*